**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

TORO CREDIT COMPANY,

Plaintiff,

Civil No. 01-CV-2349 (JEL/JGL)

v.

**ORDER**

POWERHOUSE EQUIPMENT, INC., a/k/a POWERHOUSE EQUIPMENT CO. and POWERHOUSE EQUIPMENT SYSTEMS, INC., and f/k/a/ SITEWORK SYSTEMS, INC.; BRASWELL HOLDINGS, INC., f/k/a/ SOUTHERN SHADE TREE CO. and SOUTHERN TREE & LANDSCAPE CO.; POWERHOUSE CAPITAL, INC.; ROGER S. BRASWELL; JOHN DOE; and XYZ CO.,

Defendants.

POWERHOUSE EQUIPMENT, INC. and POWERHOUSE CAPITAL,

Third-Party Plaintiffs,

v.

THE TORO COMPANY,

Third-Party Defendant.

---

Edward Fox, Esq., appeared for Plaintiff Toro Credit Company and Third-Party Defendant The Toro Company.

Scott Tyler, Esq., appeared for Defendants/Third-Party Plaintiffs PowerHouse Equipment Co. and PowerHouse Capital

FILED AUG 06 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

THIS MATTER came before the undersigned Judge of the District Court on July 18, 2002, for a hearing on Third-Party Defendant Toro Company's Motion to Dismiss, Stay, or Compel Arbitration and on Plaintiff Toro Credit Company's Motion to Dismiss Affirmative Defenses and Counterclaims. For the reasons set forth below, the Court orders that the Motion to Dismiss, Stay, or Compel Arbitration be granted and the Motion to Dismiss be granted in part and denied in part.

1. Background

This case arises from a series of contracts involving the rights to manufacture, sell, and distribute a piece of equipment known as the Dingo Compact Utility Loader (the "Dingo"). Defendants Roger Braswell ("Braswell") and Braswell Holdings, Inc. ("BHI"), a holding company owned by Braswell, were members of a limited liability company called Dingo Digging Systems, LLC ("DDS"). DDS originally owned all rights to the Dingo.

In 1997, DDS, Braswell, and BHI entered into a contract with Third-Party Defendant Toro Company ("Toro") for the sale of all rights to the Dingo. The parties executed a comprehensive Assignment of Manufacturing, Marketing and Distribution, Sale and Service Rights and Tangible and Intangible Assets ("Assignment/Sale Agreement") on August 14, 1997. On the same day, Toro and Sitework Systems, Inc. ("SSI"), another company owned by Braswell, entered into a Commission Sales Agent Agreement ("Sales Agent Agreement") which provided that SSI would act as Toro's national sales representative for the Dingo. SSI subsequently changed its name to PowerHouse Capital, Inc. ("PHC").

In late 1999 or early 2000, Braswell set up yet another company, PowerHouse Equipment, Inc. ("PowerHouse") to own or manage Toro dealerships in several states. (PowerHouse and PHC will be referred to collectively as "Defendants" below.) Toro and PowerHouse signed a series of Dealer Agreements in early 2000. The parties renewed these Dealer Agreements in August 2001. To finance the purchase of Toro products for the PowerHouse dealerships, PowerHouse entered into two Inventory Financing and Security Agreements ("Financing Agreements") with Plaintiff Toro Credit Company ("Toro Credit"). The Financing Agreements were signed in February and March of 2000, and were unconditionally guaranteed by Braswell, PHC, and BHI.

The national sales representative strategy apparently did not work as Toro hoped it would.

Toro offered to buy PHC's rights in the Sales Agent Agreement, and the parties signed an Asset Purchase Agreement to that effect in October 2000. In 2001, Braswell, PowerHouse, and PHC attempted to raise capital for PowerHouse through the private sale of stock. As noted above, Toro and PowerHouse renewed their Dealer Agreements in August 2001, although according to PowerHouse, Toro significantly changed the terms of the Dealer Agreements to the detriment of PowerHouse. Sales of the Dingo continued to fall short of Toro's expectations and in January 2002, Toro sent written notice to PowerHouse that it was terminating the Dealer Agreements. When PowerHouse failed to fulfill its obligations under the Financing Agreements, Toro Credit brought this collection action.

At issue in these Motions are the counterclaims and third-party claims that PowerHouse and PHC have asserted against Toro Credit and Toro.[1] The agreements to which Toro was a party all contain broad mediation and arbitration provisions, and thus Toro contends that the third-party claims against it must be dismissed or stayed and PowerHouse and PHC must be compelled to bring those claims in mediation and arbitration. For its part, Toro Credit argues that the counterclaims are either barred by the terms of the Financing Agreements or are claims against Toro only, and therefore must be dismissed.

There are eight counterclaims/third-party claims in the Amended Answer. These claims are: (1) fraudulent inducement; (2) civil conspiracy; (3) breach of contract; (4) fraud/intentional misrepresentation; (5) negligent misrepresentation; (6) tortious interference with contractual relations and with prospective advantage; (7) violations of the Minnesota Heavy and Utility Equipment Manufacturers and Dealers Act ("HUEMDA"), Minn. Stat. §§ 325E.068 *et seq.*; and (8) violations of the Minnesota Deceptive Trade Practices Act, Minn. Stat. § 325D.43 *et seq.* The Court will discuss the specific allegations related to each claim below.

---

[1] Braswell and BHI brought a separate Motion to Dismiss for lack of personal jurisdiction in lieu of an Answer. Judge Doty denied that Motion on July 12, 2002. To date, Braswell and BHI have not filed an Answer or any counterclaims or third-party claims.

2. Standard of Review

For the purposes of a motion to dismiss, the Court takes all facts alleged in the Complaint as truc. *Westcott v. Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). Thc Court must construc thc allegations in the claims at issue and reasonable inferences arising from those claims favorably to the party making the claims. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). A motion to dismiss will be granted only if "it appears beyond doubt that the [party] can prove no set of facts which would entitle him to relief." *Id.*; *see also Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

3. Toro's Motion to Dismiss or Stay and to Compel Arbitration

Defendants and Toro entered into no fewer than nineteen separate agreements over the course of their relationship. All of these agreements contain a clause that mandates mediation or arbitration of any dispute that "arises out of or relates to" the agreement. (*See, e.g.*, Brown Aff. Ex. A ¶ 13 (Assignment/Sales Agreement); Brown Supplemental Aff. Ex. B § 6 (Sales Agent Agreement); *id.* Exs. A-N, O-W § 16 (Dealer Agreements); *see also* Brown Aff. Ex. E § 8.4 (Asset Purchase Agreement) (mandating mediation or arbitration for disputes "arising out of or relating to the breach, termination, enforceability, scope or validity" of the agreement).) Toro seeks a dismissal or a stay of the third-party claims against it and an order compelling PowerHouse and PHC to mediate or arbitrate their third-party claims.

The Supreme Court has made clear that federal policy favors arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) (noting the "liberal federal policy favoring arbitration agreements"). Section 2 of the Federal Arbitration Act ("FAA") provides that a written arbitration agreement in "a contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable . . . ." 9 U.S.C. § 2. Here, the Agreements at issue clearly fall within the ambit of the FAA. Thus, to determine whether to compel arbitration under the FAA, the Court engages in a two-step inquiry: (1) whether there is a valid agreement to arbitrate between the parties and (2) whether the dispute falls within the scope of that arbitration agreement. *Houlihan v. Offerman & Co.*, 31 F.3d 692, 294-95 (8th Cir. 1994).

In this case, PowerHouse and PHC do not dispute that there is a valid agreement to arbitrate or that most of their claims fall within the broad arbitration provisions in the various Agreements.

Instead, they contend that their HUEMDA claim is not appropriately brought in arbitration and, because their remaining claims are inextricably intertwined with the allegations in the HUEMDA claim, it would be a waste of judicial resources to force them to arbitrate those claims separately. According to Defendants, because HUEMDA provides that a dealer "may" bring an action in a court to vindicate rights under HUEMDA, Minn. Stat. § 325E.0684, HUEMDA claims must be brought in a court, not in arbitration. They also argue that the various Agreements' Minnesota choice-of-law provisions mandate that the parties abide by HUEMDA's supposed preference for court resolution of HUEMDA claims.

PowerHouse and PHC read HUEMDA too broadly. HUEMDA simply cannot be interpreted as disfavoring arbitration to resolve disputes under the Act. The language to which Defendants point, namely that a dealer "may bring an action against a manufacturer in a court of competent jurisdiction," Minn. Stat. § 325E.0684, is clearly permissive, not mandatory. HUEMDA nowhere specifically prohibits, or even disfavors, arbitral resolution of HUEMDA claims.

Defendants cite the *Volt* case in support of the argument that Minnesota choice-of-law provisions require the Court to give precedence to HUEMDA's supposed preference for judicial resolution. *See Volt Information Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468 (1989). However, *Volt* is inapposite to Defendants' claims. In *Volt*, the Supreme Court found that where the parties had agreed to apply California law to their contract containing an arbitration clause, the FAA did not preempt California's arbitration rules providing for a stay of arbitration in certain limited situations. *Id.* at 477. The Court recognized, however, that "the FAA preempts state laws which 'require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration.'" *Id.* at 478 (quoting *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984)). Even if PowerHouse and PHC were correct that HUEMDA required a judicial forum, *Volt* dictates that the FAA preempts that requirement. Thus, the parties must mediate or arbitrate their claims according to the mediation and arbitration clauses in the various Agreements.

Toro has requested that the Court either dismiss or stay Defendants' third-party claims pending arbitration. The FAA provides that a court determining that arbitration is required "stay the trial of the action until such arbitration has been had," 9 U.S.C. § 3, and thus the Court will

grant Toro's Motion to stay the third-party claims.

4. Toro Credit's Motion to Dismiss Affirmative Defenses and Counterclaims

Toro Credit seeks to dismiss all of PowerHouse and PHC's counterclaims against it, and also asks the Court to dismiss all of the affirmative defenses listed in the Amended Answer. According to Toro Credit, Defendants' obligations to Toro Credit under the Financing Agreements are absolute and not subject to affirmative defenses or counterclaims. Further, Toro Credit contends that the majority of the counterclaims against Toro Credit are in fact claims against Toro, not Toro Credit, and that the remainder of the counterclaims fail as a matter of law.

As an initial matter, it is not clear that the Motion to Dismiss is proper insofar as it seeks the dismissal of Defendants' affirmative defenses. The Federal Rules of Civil Procedure do not provide for dismissal of affirmative defenses. Rule 12(f) does allow a party to move to strike "any insufficient defense," but Toro Credit has not brought a motion to strike. Indeed, the relief Toro Credit seeks is more akin to a declaratory judgment that Defendants are liable to Toro Credit for the amounts stated in the Complaint. Toro Credit has not sought a declaratory judgment, and such a judgment would in any event be premature. However, to the extent that the affirmative defenses mirror the challenged counterclaims, should the Court determine that a counterclaim must be dismissed, the corresponding affirmative defense would likewise be invalid.

a. Fraudulent inducement

PowerHouse and PHC's first counterclaim contends that individuals on behalf of both Toro and Toro Credit falsely represented to Braswell that Toro and Toro Credit were committed to the Sales Agent Agreement and the distributor-dealer strategy, and that as a result of those misrepresentations, PowerHouse was induced to enter into the Financing Agreements and Braswell was induced to create and invest in PowerHouse. Specifically, Defendants allege that one of the people making these representations was Steve Wolfe, who was President of Toro Credit and Chief Financial Officer of Toro.[2] (Countercl. ¶ 17.) Thus, according to Defendants, Toro Credit should

[2] The others who made the alleged misrepresentations were employees of Toro only. (Countercl. ¶ 16.)

be held responsible for the misrepresentations, even though the misrepresentations concerned only what Toro intended to do and did not involve Toro Credit.

Toro Credit argues that the fraudulent inducement counterclaim fails as a matter of law because Defendants cannot establish that their reliance on Wolfe's alleged misrepresentations was reasonable. *See Northern Petrochem. Co. v. United States Fire Ins. Co.*, 277 N.W.2d 408, 410 (Minn. 1979) (party claiming fraud must show that reliance on alleged misrepresentation was reasonable). In essence, Toro Credit asserts that PowerHouse and PHC could not reasonably rely on any of Toro Credit's representations about the Sales Agent Agreement and the distributor-dealer strategy because Toro Credit was not a party to the Sales Agent Agreement and the distributor-dealer strategy concerned Defendants' relationship with Toro, not Toro Credit.

Although this argument is not stated in the papers, Defendants argued at the hearing that Toro Credit was the alter ego or agent of Toro such that any representations by Toro Credit regarding Toro's intentions could have been reasonably interpreted by PowerHouse and PHC as representations by Toro itself. Defendants claim that whether such an agency relationship existed is a question of fact that renders summary judgment on the fraudulent inducement counterclaim inappropriate. Even if the statements could be attributed to Toro under an agency theory, Defendants do not explain why they would have interpreted representations concerning matters solely between Toro and Defendants made by a person who was an employee of both Toro and Toro Credit as representations by Toro Credit. Nor do Defendants offer any legal support for this position.

Even assuming that Toro Credit was the alter ego of Toro, Defendants have failed to show that their reliance on Wolfe's alleged misrepresentations about Toro's intentions was reasonable. Thus, their fraudulent inducement claim against Toro credit fails as a matter of law and must be dismissed.

b. Civil conspiracy

In their second counterclaim, PowerHouse and PHC allege that the actions of Toro and Toro Credit were a conspiracy to accomplish an unlawful purpose or a lawful purpose by unlawful means. They contend that a dismissal of this counterclaim would amount to a finding that

Minnesota law does not recognize a claim for civil conspiracy.

Under Minnesota law, a cause of action alleging conspiracy cannot exist independently but must be based on the commission of an underlying wrong. *Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 551 (8th Cir. 1996). Moreover, the wrong underlying the conspiracy must amount to a criminal act or an intentional tort. *In re O-Jay Foods, Inc.*, 1991 WL 378164, at *21 (D. Minn. July 5, 1991) (MacLaughlin, C.J.). Technically speaking, "there is no such thing as a civil action for conspiracy" in Minnesota. *Harding v. Ohio Cas. Ins. Co.*, 41 N.W.2d 818, 824 (Minn. 1950). The purpose of a claim for civil conspiracy is "to show facts for vicarious liability of defendants for acts committed by others, joinder of joint tortfeasors, and aggravation of damages." *Id.*

Although PowerHouse and PHC do not specify the wrongs underlying their claim for civil conspiracy, the Court will assume that the various intentional torts alleged in the counterclaims constitute the basis for this claim. However, as noted above and discussed more fully below, PowerHouse and PHC have failed to state any counterclaims against Toro Credit. Because Toro Credit is not liable for any of the intentional torts alleged in the counterclaims, the counterclaim for civil conspiracy against both Toro Credit and Toro fails as a matter of law. *See Harding*, 41 N.W.2d at 824 (conspiracy is "combination of persons").

c. <u>Breach of contract</u>

The third counterclaim alleges that Toro Credit breached the Financing Agreements by failing to credit PHC for reconditioned goods sold as new. PowerHouse and PHC do not point the Court to any provision in the Financing Agreements requiring such credit, and a review of the Agreements reveals no such provision. Thus, it appears from the allegations that PowerHouse and PHC are challenging the fact that Toro allegedly provided reconditioned goods to PowerHouse and charged PowerHouse as if those goods were new. Such a challenge is properly directed at Toro, however, not at Toro Credit. Indeed, the Financing Agreements specifically preclude an action against Toro Credit for alleged bad acts of Toro. (Sonderup Aff. Ex. C ¶ 4(i) ("Dealer agrees not to assert against Toro Credit any defense, counterclaim, set off, cross complaint or any claim which Dealer now has or acquires against [Toro] . . . .").) This counterclaim must be dismissed.

d. Fraud/intentional misrepresentation

According to PowerHouse and PHC, individuals connected with both Toro and Toro Credit fraudulently represented that Toro would not make changes to the Dealer Agreements. Even taking this allegation as true, PowerHouse and PHC do not explain how Toro Credit could be responsible for whatever changes Toro allegedly made to the Dealer Agreements. Toro Credit was undisputedly not a party to the Dealer Agreements. Thus, any statements Toro Credit might have made regarding those Agreements is simply not a statement on which PowerHouse and PHC could rely, as a matter of law. *See supra* section 4.a. This counterclaim must be dismissed.

e. Negligent misrepresentation

The fifth counterclaim contends that Toro and Toro Credit made negligent misrepresentations regarding the Dealer Agreements and the price and status of inventory. As discussed with respect to the fraudulent misrepresentation and breach of contract claims above, however, this is a claim properly brought only against Toro. Toro Credit was not a party to the Dealer Agreements, and the Financing Agreements are clear that Toro Credit did not set the price of inventory nor can it be liable for Toro's representations regarding the inventory. (Sonderup Aff. Ex. C ¶ 4(i).) This counterclaim must be dismissed.

f. Tortious interference with contractual relations/prospective advantage

In their sixth counterclaim, PowerHouse and PHC allege that Toro and Toro Credit interfered with PowerHouse's relationships with persons willing to buy PowerHouse's stock in the private sales. This interference took the form of alterations to the terms of the Dealer Agreements and alleged misrepresentations that the terms of the Dealer Agreements would not change. Again, however, Toro Credit was not a party to the Dealer Agreements and was not responsible for the terms of those Agreements. This counterclaim must be dismissed.

g. HUEMDA

This counterclaim does not mention Toro Credit in any way and appears to be directed solely at Toro's alleged misconduct. It is therefore dismissed.

h. Deceptive Trade Practices Act

According to the eighth counterclaim, Toro and Toro Credit sold reconditioned goods as

new, and also induced PowerHouse to buy products and then cut the price of those products. This claim is essentially that these actions by Toro violated the Deceptive Trade Practices Act and seeks to hold Toro Credit liable for that violation. However, the terms of the Financing Agreement clearly preclude any claims against Toro Credit for alleged nefarious actions of Toro. (Sonderup Aff. Ex. C ¶ 4(i).) This claim must be dismissed.

5. Order

ACCORDINGLY, IT IS HEREBY ORDERED THAT:

1. Plaintiff Toro Credit Company's Motion to Dismiss [Docket No. 37] be GRANTED.
2. Defendant PowerHouse and PHC's Counterclaims against Plaintiff Toro Credit Company [Docket No. 11] be DISMISSED WITH PREJUDICE.
3. Third-Party Defendant Toro Company's Motion to Dismiss or Stay and Compel Arbitration [Docket No. 29] be GRANTED.
4. The Third-Party Complaint [Docket No. 12] be STAYED pending submission of the claims to mediation or arbitration.

Dated: August 6, 2002

JOAN ERICKSEN LANCASTER
United States District Judge